# RUSSELL & WOOFTER LLC

1701 Pennsylvania Ave. NW, Suite 200
Washington, DC 20006

December 12, 2025

**BY CM/ECF**

Catherine O'Hagan Wolfe
Clerk of the Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:     Plaintiffs-Appellants' Supplemental Letter Brief In No. 23-929, *J. Scott Nicholson et al. v. HSBC Bank USA, N.A., et al.*, Regarding *Sonterra Cap. Master Fund, Ltd. v. UBS AG*.

## INTRODUCTION

*Sonterra Capital Master Fund, Ltd. v. UBS AG*, 152 F.4th 404 (2d Cir. 2025), supports reversal. *Sonterra* confirms what this Court has already established: that plaintiffs alleging *multidirectional* benchmark manipulation—where defendants "sometimes elevat[e] and sometimes depress[]" a benchmark depending on their positions—"must 'plead additional facts'" about the timing and direction of their trades to establish antitrust injury. *See id.* at 411 (quoting *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 113 (2d Cir. 2018)). Plaintiffs sufficiently plead antitrust injury in such cases when the complaint identifies instances of defendants' price-fixing manipulation adverse to plaintiffs' contemporaneous trades. *See, e.g.*, *Sullivan v. UBS AG*, 149 F.4th 206, 223-24 (2d Cir. 2025). But *Sonterra* expressly preserved *Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016), for antitrust claims alleging "unidirectional" price-fixing conspiracies, as here—where "we might reasonably infer, at the motion-to-dismiss stage, that [plaintiffs] [have] suffered some sort of pecuniary harm," so the complaint need not connect the dots between specific instances of manipulation to simultaneous plaintiff-side transactions the other direction. *See Sonterra*, 152 F.4th at 412. That permissible "inference" in unidirectional price-fixing cases, *Sonterra* explained, only "becomes unreasonable when the alleged conduct both inflated and deflated prices." *Ibid.* (citing *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 78-79 (2d Cir. 2022)).

This case involves unidirectional manipulation. Plaintiffs allege that Defendants systematically and consistently *suppressed* the Silver Fix—not that they pushed it up or down depending on the day. *In re Platinum & Palladium Antitrust Litigation*, 61 F.4th 242 (2d Cir. 2023), which *Sonterra* did not question, remains controlling. *Platinum & Palladium* was born out of the same government investigations and public reports as *Silver*—uncovering the unlawful conduct by the banks responsible for fixing the global benchmark used to price these precious metals. *See infra* Part III. And the complaint here largely rests on the same well-pleaded factual foundation as *Platinum*—a stronger one, in fact, because Plaintiffs included direct chat evidence that the *Platinum* pleading lacked. *See ibid.*

## I. *Sonterra* Confirms That Unidirectional Benchmark Manipulation Easily Supports An Inference Of Injury In This Case.

In *Sonterra*, investors who traded Sterling LIBOR-based derivatives alleged that sixteen panel banks conspired to "suppress, inflate, maintain, or otherwise alter Sterling LIBOR" depending on their trading positions on any given day. 152 F.4th at 407-08. The co-conspirators were thus accused of "sometimes elevating and sometimes depressing LIBOR." *Id.* at 412. This Court dismissed the claims, reaffirming that "[i]n cases of such sporadic and multidirectional manipulation," plaintiffs "must 'plead additional facts to make it plausible that the impact on [them] was harmful rather than neutral or beneficial.'" *Ibid.* (quoting *Total Gas*, 889 F.3d at 113).[1]

*Sonterra* distinguished *Gelboim* on precisely this basis. In *Gelboim*, this Court sustained plaintiffs' claims that they suffered antitrust harm when "'they paid artificially fixed *higher* prices,'" because they alleged that defendants "uniformly and consistently '*depressed* LIBOR,' which necessarily 'reduced plaintiffs' rates of return.'" *See Sonterra*, 152 F.4th at 411 (quoting *Gelboim*, 823 F.3d at 771, 777) (brackets omitted; emphasis in original). "While we might reasonably infer, at the motion-to-dismiss stage, that an antitrust plaintiff has suffered some sort of pecuniary harm in a case involving *unidirectional* market manipulation, that

---

[1] *Sonterra* also believed that because "Sterling LIBOR used only the middle fifty percent of sixteen daily reports from different banks," plaintiffs failed to plausibly allege that any given manipulated report could cause them antitrust harm. *See* 152 F.4th at 410-11. Regardless of the merit of that holding, it has no application here, where only three banks participated in the daily Walrasian auction during the Class Period. JA509-511 ¶¶119-123. When all three conspire—an allegation Defendants do not dispute, *see* Fixing Br. 69—causation is structural, not speculative.

inference becomes unreasonable," the Court explained, "when the alleged conduct both inflated and deflated prices." *Id.* at 412 (emphasis added).

*Sonterra* therefore confirms what plaintiffs have argued all along—that cases "involving ... multidirectional market manipulation" are different from cases like this one. *See Sonterra*, 152 F.4th at 411 (discussing *Gamma Traders*, 41 F.4th 71). As *Gamma Traders* teaches, unidirectional "price-fixing behavior—unlike spoofing—results in harms to all market participants, without the possibility of some market participants inadvertently benefitting from the illegal conduct," because such "price-fixing conspiracy aims to consistently push the market price in a single direction, whereas ... spoofing can artificially move the market in either direction." *See id.* at 79. That is why the Court "affirmed the district court's dismissal of the complaint" in *Gamma Traders*, "explaining that the plaintiff's allegations did not 'support a reasonable inference that Defendants' spoofing conduct injured it'"; since "'spoofing can artificially move the market in either direction,'" it "was 'not at all clear whether ... the plaintiff incurred a net loss or a net benefit from it.'" *See Sonterra*, 152 F.4th at 411 (quoting *Gamma Traders*, 41 F.4th at 78-79) (brackets omitted).

Crucially, *Sonterra* did not question *Platinum*. The panel did not even mention the case, probably because *Platinum* is a straightforward application of the principles announced a decade earlier in *Gelboim*. In *Platinum*, this Court reversed the district court's dismissal of antitrust and CEA claims alleging that defendants systematically suppressed the global platinum and palladium benchmarks. *See* 61 F.4th at 265-68. Again, *Sonterra* confirmed "that an antitrust plaintiff has suffered some sort of pecuniary harm in a case involving unidirectional market manipulation" as alleged here, *Platinum*, and *Gelboim. See Sonterra*, 152 F.4th at 412.

Thus, *Sonterra* changes nothing. The critical distinction in pleading standards remains between:

- Unidirectional manipulation: Defendants consistently push prices in one direction in a once-daily (*Gelboim*) or twice-daily (*Platinum*) benchmark → injury can be inferred where plaintiffs allege they paid higher prices or suffered a reduced rate of return.

- Multidirectional manipulation: Defendants push prices up or down depending on their positions (*Sonterra*), potentially multiple directions the same day (*Gamma Traders*) → plaintiffs must identify at least one contemporaneous transaction in which they were harmed.

3

## II.  The Complaint Alleges That Defendants Manipulated The Silver Fix In One Direction During The Class Period (Down), Harming Plaintiffs.

Unlike *Sonterra*, Plaintiffs allege that Defendants systematically suppressed the Silver Fix price in one direction: *down*. The complaint's econometric analysis establishes this unidirectional pattern with precision.

*Frequency*: Silver prices dropped during the Fix at an "abnormally high frequency." *See* JA524-528 ¶¶151-156. Figures 5, 6, 7, and 8 particularize a 2 to 1 ratio of "Down Days" as opposed to "Up Days"; and the Silver Fix's downward suppression of the spot market for physical silver, where "the percentage of days where the Fix price is lower than the price of silver at the start of the call is significantly larger" and "physical silver prices decrease during the Silver Fix regardless of what they are at noon London time." *See ibid.*

*Magnitude*: The decreases were "abnormally large"—"by far the largest price drop[] of the day" and "highly statistically significant." *See* JA520-524 ¶¶143-150. Figures 2, 3, an 4 particularize "that COMEX silver futures cumulative unadjusted returns begin to decrease just before the start of the Silver Fix"; the "10 basis point drop in COMEX silver futures prices" is "not just the largest price drop of the day, it is also highly statistically significant and represents a distinct break from other market activity"; and that this "same break from pricing behavior is also visible in the spot market for physical silver." *See ibid.*

*Persistence*: The suppression "had a persistent impact on silver prices well beyond the end of the Fixing call." *See* JA557-559 ¶¶195-198. Figure 33 demonstrates that on Down Days, "this large price drop has a lasting impact on the prices of COMEX silver futures contracts, extending well beyond the end of the Silver Fix." JA557-558 ¶196. "Following the solid black line, which indicates the mean cumulative unadjusted returns throughout the day, the price of silver on Down Days *does not* recover fully from the price drop that occurs at the start of the Silver Fix." JA558 ¶196. Figure 34 shows that the "same is true for silver prices in the spot market"; on Down Days, "the spot market price of silver *never recovers* to pre-Silver Fix levels." JA558 ¶197. "As displayed in both figures, the prices of COMEX silver futures contracts and physical silver do not recover from the price drops induced by the Silver Fix on Down Days, beginning the next trading day lower." JA669 ¶198. And "[b]ecause there are substantially more Down Days than Up Days, and the size of price drops around the Silver Fix are substantially larger than any price increase, the result of the dysfunction in silver pricing caused by the Silver Fix is a persistent suppression of silver prices throughout the Class Period." *Ibid.* "As a result, the Silver Fix affected the prices of silver and silver financial instruments well beyond

4

the end of the Fixing Member's daily conference call and the release of the Fix price." *Ibid.*

*Contrast with Broader Market*: The suppression occurred even during "a historic bull run" in silver prices, "when the price of silver is continuously increasing," yet "the Silver Fix consistently causes a large decrease in silver prices during the daily conference call." JA533 ¶162.

Defendants may argue that the alleged manipulation was "episodic" or occurred on discrete days. But as discussed above, *Sonterra*'s concern was *directional inconsistency*, not frequency. A scheme to suppress prices on each of 1,754 trading days, JA534 ¶¶163-164, is still unidirectional even if each day's suppression is a discrete event. *See Platinum*, 61 F.4th at 263-66 (NYMEX traders had standing where twice-daily Fixings were consistently manipulated downward and traders alleged "defendants 'profited from their manipulation ... at the expense of' the Exchange" plaintiffs (alterations in original)); *see also Sonterra*, 152 F.4th at 412 (once-daily LIBOR manipulation sufficient where defendants "uniformly and consistently '*depressed*'" the benchmark in *Gelboim* (quoting 823 F.3d at 771) (brackets omitted)).

Further, the complaint here identifies hundreds of specific days on which Defendants manipulated silver prices downward *and* Plaintiffs *sold* silver futures. *See* JA752-57 (listing dates of manipulation); JA758-69 (listing Plaintiffs' trades on dates of manipulation). That is sufficient for Plaintiffs to meet the more stringent test for pleading injury in *multidirectional* manipulation cases. *See, e.g.*, *Sullivan v. UBS AG*, 149 F.4th 206, 223-24 (2d Cir. 2025). Accordingly, there can be no question that Plaintiffs allegations easily suffice for this *unidirectional* manipulation case like this. *See Sonterra*, 152 F.4th at 412 (contrasting *Gelboim*, 823 F.3d at 771-72, with *Gamma traders*, 41 F.4th at 78-79).

## III. The Complaint's Well-Pleaded Facts Exceed *Platinum*'s.

*Platinum* and this case include materially identical allegations on the same types of evidentiary support. In both cases, plaintiffs transacted in exchange-traded derivatives for precious metals whose prices were based, in part, on unlawfully suppressed benchmarks used to price precious metals financial instruments in the United States. In both, plaintiffs alleged that defendants furthered the benchmark conspiracy by trading on U.S. exchanges before and during the Fix. This Court held that *Platinum* exchange trading plaintiffs had antitrust standing. 61 F.4th at 263-66. The complaint here went even further, adding direct chat evidence that *Platinum* lacked.

*Econometric Analysis*. The *Platinum* complaint included charts and empirical data demonstrating that the exposed asymmetry "was 'statistically significant,'" revealing that "the *only* time of the day for which there are *consistent* negative returns is around the Fixing." *See Platinum* Third Amended Complaint ("*Platinum* TAC") ¶¶133-136. The complaint here includes the same type of analysis: charts and empirical data showing frequent, unusual price drops around the Fix, JA518-533 ¶¶142-162, as well as volume spikes in both the spot and COMEX markets for silver before and during the Fix, predictive trading patterns, and persistence of price effects, JA534-559 ¶¶163-198.

*Inference of Manipulation*. The *Platinum* complaint inferred that the defendants "drove these downward movements first by moving Physical and NYMEX Platinum and Palladium prices in advance of and even during the Fixing." *Platinum* TAC ¶10. It drew that inference by observing that trading patterns indicating the price movements were "the result of manipulation and not natural market forces." *Platinum* TAC ¶11. "In a fully competitive environment, over a long enough time horizon, there is no reason to expect" such "asymmetrical price movements." *See Platinum* TAC ¶11. The complaint here pleads the same inference: The spike in trading volume "is significant because it almost always occurs while the Silver Fix is still in progress," i.e., "while the Fixing Members are still on the phone *before* the Fix price is released to the public" and supposedly "known only to the Fixing Members." JA535 ¶165. As to the spike in COMEX trading specifically, Plaintiffs' complaint infers that "the increased trading volume during the Silver Fix is most plausibly explained as trading by the Fixing Members, who are already scheduled to meet at that time, and their co-conspirators, who are given access to private information from inside the Silver Fix." JA541 ¶176.

*Regulatory Findings*. The *Platinum* complaint and this case supported these inferences by citing CFTC settlements regarding FX manipulation, noting that "these are the same techniques Defendant HSBC employed to manipulate the foreign exchange markets." *Platinum* TAC ¶10 n.4; *see* JA601 ¶268 & nn.101-102, JA604 ¶275 & n.108. Both *Platinum* and the complaint here also cite the Swiss Financial Market Supervisory Authority (FINMA) findings as to non-Fixing Bank co-conspirator UBS, which is even more on-point, because FINMA found that UBS participated directly in Fix-related manipulation. Both quote FINMA's findings that UBS engaged in "clear attempts to manipulate fixes in the precious metals markets." *See Platinum* TAC ¶172 (quoting FINMA report); JA543 ¶178 (same). As both complaints further quote, this included "repeated front running ... of silver fix orders," and improperly sharing "flow information" with co-conspirators. *Platinum* TAC ¶233 (quoting FINMA report); JA543 ¶179 (same); *see also* JA543 ¶179

6

(quoting from FINMA report that UBS also engaged in "triggering of client stop-loss orders").

*Pre-Fix Trading/"Alter the Starting Price."* This Court reversed the district court in *Platinum* for dismissing as "implausible" the theory that defendants traded on NYMEX "*for the purpose of manipulating the benchmark price*." 61 F.4th at 268 (quoting *Platinum* TAC ¶251). The Court held that "[b]y moving Physical and NYMEX Platinum and Palladium prices in advance of and even during the Fixing," the defendants "'alter[ed] the starting price'" for the Fixing and "'g[ave] cover' to the defendants' manipulation of the Fixing." *Ibid.* (quoting *Platinum* TAC ¶10). As Plaintiffs explained, the complaint's well-pleaded facts lead to the same inference: Defendants' pre-Fix COMEX trading caused "falling prices [that] would then serve as inputs for the Fix, driving down the current spot price for silver that would open the auction." Opening Br. 51.[2]

*Platinum*'s evidentiary basis for this theory was econometric analysis and inference—not direct evidence. Thus, the same Defendants and counsel argued there, as they have tried here, that "[al]though plaintiffs seek to recharacterize their complaint as alleging manipulative conduct on NYMEX, the allegations they point to concern either innocent domestic conduct or alleged misconduct taking place overseas." *See* Brief of Appellee HSBC Bank USA, N.A. 46, *In re Platinum & Palladium Antitrust Litig.*, No. 20-1458, ECF No. 115 (2d Cir. Nov. 5, 2020). This Court did not accept that argument and reversed. *Platinum*, 61 F.4th at 268.

---

[2]      *See* JA507 ¶111 ("... Defendants' traders show that they routinely used the GLOBEX platform to transact in silver futures and options contracts on COMEX and/or the CBOT, purposefully directing their manipulative conduct at the United States ...."); JA520 ¶144 ("... COMEX silver futures cumulative unadjusted returns begin to decrease just before the start of the Silver Fix."); JA521 ¶145 ("The drop in COMEX silver futures prices observed during the Silver Fix is not just the largest price drop of the day, it is also highly statistically significant and represents a distinct break from other market activity."); JA521 ¶146 ("[I]n the 10 minutes leading up to the start of the Silver Fix, the unadjusted returns breakout from their observed range, with multiple five-minute intervals showing negative returns. The Silver Fix is the *only* part of the day where there is such a concentration of negative returns."); JA522 ¶147 ("Only during the Silver Fix is there a series of price drops well outside the 99.9% confidence interval. This is unique and distinguishes the Silver Fix from other times of the day.").

*Direct Chat Evidence*. Both cases allege "that HSBC and other banks used private chat rooms to communicate and plan their manipulation." *Platinum* TAC ¶231; *see, e.g.*, JA603 ¶274 ("To efficiently share information and coordinate their trading activity, Defendants including participants from UBS, HSBC, and other co-conspirator banks, used electronic chatrooms."). Unlike *Platinum*, the complaint here actually included the direct chat evidence showing coordination between Fixing and Non-Fixing Banks to manipulate the Fix through pre-Fix trading. For example:

- Fixing Bank Deutsche Bank and Non-Fixing Bank Fortis coordinated to sell "70's TOGETHER" in advance of the Fix, with Deutsche Bank noting "BOTH MKTS ARE AS THIN AS IVE EVER SEEN THEM" and advising "ILL BE A LIGHT SELLER ON THE FIX SO WATCH YOUR SCREEN." JA616-617 ¶297.

- Deutsche Bank informing a Fortis trader "I got the fix in 3 minutes," with the Fortis trader responding, "Let's go and smash it together." JA625 ¶310.

- Deutsche Bank relaying live Fix information to Fortis—including what other banks were buying or selling and at what prices—and instructing: "KEEP A SMAL SHRT ... ADD IF WE START BREAKING DOWN." JA622-623 ¶306.

- Deutsche Bank describes Non-Fixing Bank UBS as "THE SILVER MARKET .... *on the fixes*," as a UBS trader replies, "we smashed [the Fix] good." JA625 ¶311 (emphasis added).

- UBS suggests to Deutsche Bank that "'if we are correct and do it together, we screw other people harder,'" to capitalize on the zero-sum nature of derivatives trading, including in COMEX silver futures contracts. *See* JA483 ¶14.

The evidentiary foundation here is thus stronger than in *Platinum*. The *Platinum* plaintiffs alleged the "alter the starting price" theory based on econometric inference alone. Plaintiffs here have that inference plus direct evidence of Defendants agreeing to do precisely what the *Platinum* complaint inferred.

## IV.    Leave To Amend Should Be Granted If Necessary.

If the Court concludes that the complaint requires more explicit "purpose" or "alter the starting price" language, leave to amend should be granted. The well-pleaded evidentiary basis for the *Platinum*-style allegations is already in the

complaint. Amendment would require only adding the conclusory inferences directly into the complaint that *Platinum* stated explicitly: that Defendants' pre-Fix trading on COMEX was undertaken "for the purpose of manipulating the benchmark price," and that Defendants manipulated COMEX to "alter the starting price" for the Silver Fix and "give cover to an auction-rate that would otherwise have stood out." These conclusions follow directly from the allegations already in the complaint.

The timing also favors amendment. The Third Amended Complaint was filed in June 2017. JA473. *Platinum* was decided in February 2023—nearly six years later. Indeed, the entire framework on which Defendants rely postdates the complaint. *Total Gas* was decided in 2018. *Gamma Traders* was decided in 2022. Plaintiffs had no notice that their allegations—which parallel *Platinum*'s in every meaningful way—would be deemed insufficient under legal standards that did not exist when they filed. Nor did the proceedings provide such notice: In *Silver I*, the district court accepted Plaintiffs' allegations as sufficient. *See* SA1-61. If the panel deems it necessary, amendment to conform the complaint's language to *Platinum*'s formulations requires no new facts—only the explicit statement of inferences the existing allegations already support.

Respectfully submitted,

Daniel Woofter
*Counsel of Record*